No. 29,043.

The Dolan Mercantile Company, *Appellee,* v. The Wholesale Grocery Subscribers at Warner Interinsurance Bureau et al., *Appellants.*

(291 Pac. 935.)

Opinion filed October 11, 1930.

*Ralph U. Pfouts,* of Atchison, *John M. Zane* and *Harold W. Norman,* both of Chicago, Ill., for the appellants.

*W. P. Waggener, J. M. Challiss, O. P. May* and *B. P. Waggener,* all of Atchison, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one by the Dolan Mercantile Company to recover insurance money claimed to be due on account of loss by fire. Plaintiff recovered, and those against whom judgment was rendered appeal.

The original defendants were Wholesale Grocery Subscribers at Warner Interinsurance Bureau, Chicago, Ill., and Lansing B. Warner, Incorporated, of Chicago, Ill., attorney in fact for the Subscribers. The Subscribers had been given certificate of authority to do business in this state pursuant to R. S., ch. 40, art. 11. Acting by their attorney, they issued policies of insurance insuring the mercantile company against loss by fire on its stock of merchandise. After the action was commenced the Subscribers were succeeded by Warner Reciprocal Insurers, who took over all accounts, funds and property of the Subscribers. Warner Reciprocal Insurers were granted certificate of authority to do business in this state, acted by Lansing B. Warner, Incorporated, as attorney, and were made a party defendant. The judgment was rendered against the three defendants.

The mercantile company's stock of merchandise was contained in a building situated on lots 112, 114, 116, 118 on South Second street, in the city of Atchison, and was insured in eighteen companies and associations for a total sum of $254,500. Of this amount, $100,000 was represented by two policies issued by the Subscribers, one for $60,000 and one for $40,000.

A fire occurred, and the mercantile company notified the Subscribers by a telegram, reading as follows:

"Building and contents one hundred twelve to one hundred fourteen South Second almost total loss by fire smoke and water damage to contents and building one hundred fourteen to one hundred sixteen South Second. Please rush adjustment."

Adjusters for the various insurers appeared and adjusted the loss. In arriving at sound value of the merchandise at the time of the fire, and amount of loss, separate sets of figures were made for the

merchandise in the part of the building where the greater loss was reported, and for the merchandise in the remainder of the building. After differences of opinion respecting sound value and amount of loss, the mercantile company and the adjusters signed a memorandum of agreement that the sound value of the merchandise at the time of the fire and the loss were as follows:

Sound value:
| | | |
|---|---|---|
| Lots 112-114 | ..................................... | $181,736.94 |
| Lots 116-118 | ..................................... | 107,542.99 |
| Total | ..................................... | $289,279.93 |

Loss:
| | | |
|---|---|---|
| Lots 112-114 | ..................................... | $150,000.00 |
| Lots 116-118 | ..................................... | 26,836.65 |
| Total | ..................................... | $176,836.65 |

At the adjustment the mercantile company was represented by its vice president, Nusbaum. The Subscribers were represented by F. B. Welpton, of Kansas City, Mo. At the trial, Nusbaum testified as follows:

"When we signed the agreement with the adjusters I said to Mr. Welpton, what does this mean, and he said it means that you will get $176,836.65 in cash; just how that will be distributed between the insurance companies, I do not know, but you will get the money."

When the adjusters undertook to apportion the loss among their clients, they disagreed. Welpton's computation gave the total amount of liability of all insurers as $168,054.69, and the Subscribers' share of the loss as $60,056.41.

Welpton prepared and forwarded to the mercantile company for execution proofs of loss according to Welpton's apportionment. Nusbaum went to Kansas City to see Welpton and find out why the whole loss was not to be paid. Welpton gave Nusbaum no satisfactory explanation. Nusbaum then consulted the superintendent of insurance of the state of Kansas. In a letter written by Nusbaum to Warner, Incorporated, explaining Nusbaum's conduct, appears the following:

"On account of the big loss which we had and on account of the peculiar financial conditions, with which you are as familiar as we are, we were in no position to have this amount of money tied up in the courts, and our position was explained to the superintendent of insurance of Kansas. He advised us to sign proofs of loss in any amount in order that we might get into our business as quickly as possible the major portion of our money and if the companies did not treat us fairly, that we had the privilege of consulting him again."

Following the advice of the superintendent of insurance, Nusbaum signed the proofs of loss and they were forwarded to Warner. They contained Welpton's apportionment, which included an adjuster's note giving the basis and reasons for the apportionment. The Subscribers paid according to the claim made in the proofs of loss, and the mercantile company signed receipts "in full payment and compromise settlement" of the claims and demands for loss and damage by the fire. Other insurers paid, and the result was the mercantile company did not receive the agreed amount of its loss.

The superintendent of insurance promptly opened the apportionment because, as he said, it was evident an illegal attempt had been made to penalize the insured. After notice, a meeting was held in the office of the superintendent of insurance, at which all of the insurers were represented by adjusters; Welpton appeared for the Subscribers. At that meeting an apportionment was agreed to by all of the adjusters which compensated the insured in full. On the basis of the reapportionment, some companies had paid less than their share; they agreed to pay on the basis of the reapportionment and did so. On the basis of the reapportionment, some insurers had overpaid; the mercantile company agreed to reimburse them and did so. Notwithstanding the fact that Welpton admitted the original apportionment was wrong, agreed to the new apportionment, and agreed payment would be made according to the new apportionment, the Subscribers refused to pay the additional sum due from them, $9,427.53.

The mercantile company sued on the two policies issued by the Subscribers for the balance due, with interest from May 12, 1921, the date of the fire. Issues were framed, and the case was tried by the court. Findings of fact and conclusions of law, separately stated, were filed by the court, and judgment was rendered accordingly. A motion for new trial was filed and denied, and notices of appeal were served and filed.

The findings of fact and conclusions of law were filed by the court on November 10, 1928, and constituted the decision of the court within the meaning of the statute fixing the time within which motion for new trial may be filed. (*Brubaker v. Brubaker*, 74 Kan. 220, 86 Pac. 455; *Alexander v. Clarkson*, 96 Kan. 174, 150 Pac. 576; *Milling Co. v. Schreiber*, 102 Kan. 172, 169 Pac. 222.) The statute required that the motion be filed within three days after the decision. The motion was filed on December 8, 1928, was filed too

late, and claimed errors which should have been called to the attention of the trial court by proper motion for new trial may not be considered.

A portion of finding No. 22 as originally made was that a policy of insurance issued by the Subscribers after payment according to claim of loss made in the proofs of loss was not introduced in evidence. On December 8, and before the motion for new trial was filed, counsel for defendants orally called the court's attention to the fact that the policy was introduced in evidence. That constituted a specific challenge of that portion of the finding, but was not a motion for new trial. The court corrected the finding to show the policy was introduced in evidence. The error was corrected within the term of court at which the finding was filed, the incident closed with the correction, and the time for moving for a new trial, which had expired long before the incident occurred, was not revived.

Later in the proceedings in the district court, defendants contended the findings of fact and conclusions of law were tentative only when filed, and so did not constitute the court's decision. The court knew what it did, and, to settle the matter, made a finding that the findings of fact and conclusions of law filed on November 10 were final and not tentative. Other excuses offered by defendants for not filing the motion in time have been considered and are without merit.

The district court considered the motion for new trial. The action of the court in disposing of the motion was that the court "finds said motion should be overruled, and it is so ordered." Because the record affirmatively shows the motion was not filed in time, and no specific ground for denying the motion was stated by the district court, this court must assume the motion was denied because it was filed too late. (See *Brewing Association v. Wolff,* 53 Kan. 323, 36 Pac. 711.)

The motion for new trial may not be considered for another reason. The findings of fact and conclusions of law being favorable to plaintiff, plaintiff moved for allowance of an attorney fee. The motion, which affected amount of recoverable costs only, was heard on December 8, 1928, and the court allowed plaintiff an attorney fee of $2,500 to be taxed as costs. Judgment was then rendered disposing of the controversy. Following rendition of the judgment, the motion for new trial was filed. The motion was heard and was denied on January 4, 1929. On May 7, 1929, the Subscribers filed

notice of appeal, stating they appealed from "the decision" of the district court. On June 27, 1929, Warner Reciprocal Insurers and Lansing B. Warner, Incorporated, filed a notice of appeal, stating they appealed from the "decision and judgment" of the district court.

The civil code contains the following provisions:

"A judgment is the final determination of the rights of the parties in an action." (R. S. 60-3101.)

"Every direction of a court or judge, made or entered in writing, and not included in a judgment, is an order." (R. S. 60-3103.)

"Appeals to the supreme court shall be taken by notice filed with the clerk of the trial court, stating that the party filing the same appeals from the judgment, order or decision complained of to the supreme court, and if the appeal is taken from only a part of the judgment, or from a particular order or decision, then by stating from what part of the judgment, or from what particular order or decision the appeal is taken . . ." (R. S. 60-3306.)

The word decision is not defined by the code. The notices of appeal were specific—"the decision"—but they did not state the particular decision from which the appeal was taken.

In this instance the decision was the finding of the court on the questions of fact and of law made on November 10, 1928. The judgment was the pronouncement of December 8, 1928, whereby the rights of the parties were finally determined—judgment for a stated sum, for costs, and for attorney fees as a part of the costs. The pronouncement denying the motion for new trial was an order. It is true that, speaking generally, there was a decision respecting the motion for new trial. It consisted in the court's statement, "The court . . . finds that said motion should be overruled." It still required judicial action on the finding to put an end to the new trial matter. This was done by the order, "And it is so ordered." The result is, no appeal was taken from the order denying a new trial.

The findings of fact and conclusions of law, and the judgment were the things which determined the merits of the controversy. The motion for new trial was filed without authority of law, and the order denying the motion was a postjudgment order. Leaving at one side the requirement of the statute that the particular decision from which the appeal is taken must be specified, this court declines to assume that the notices of appeal regarded the order denying the motion as "the decision" in the case.

Plaintiff has filed a motion to dismiss the appeal of Warner Reciprocal Insurers and Lansing B. Warner, Incorporated. The

appeal is subject to dismissal because their notice of appeal was not served within six months after the decision and judgment. Various contentions in opposition to the motion to dismiss have been considered and are held to be without merit.

Technically, the appeal of the Subscribers is subject to dismissal because proper notice of appeal was not filed. While the notice mentioned "the decision of the district court," it did not specify any particular decision. Assuming the notice referred to the decision proper, the question would be, Did the decision necessitate the judgment for plaintiff? Assuming the notice referred to the judgment, the appeal would bring up for review the validity of the judgment as a consequence of the findings of fact.

As indicated, the findings of fact are not assailable on any ground on which a timely motion for new trial might have been based. The court may not consider whether the trial was fairly conducted, whether evidence was erroneously admitted or rejected, or whether the findings were sustained by evidence. Besides that, no complaint was made of the findings other than by the belated motion for new trial, except the minor complaint which has been referred to. Therefore, the findings of fact stand as the unquestioned facts of the case. With the facts established, this court can apply the law, and going immediately to the heart of the controversy, the question in the case is this: Was Welpton's apportionment of loss right or wrong?

The following shows what Nusbaum, for the mercantile company, agreed to with the adjusters, and is what Welpton put in the proofs of loss which Nusbaum signed for the mercantile company:

"STATEMENT OF LOSS: PROPERTY.

DOLAN MERCANTILE CO.

Loss: May 12, 1921.        Atchison, Kansas.

"As agreed in detail between assured and adjusters, based on assured's books and records, and on verified schedule, viz.:

*Nos. 116-118 South Second Street.*

| Contents. | | Sound value. | Loss. |
|---|---|---|---|
| Basement, stock | $24,717.46 | $14,830.48 | |
| First floor, stock | 50,124.98 | 5,012.50 | |
| Second floor, stock | 15,299.18 | 1,529.92 | |
| Cigar room, third floor | 7,173.55 | 573.88 | |
| Tablet room, third floor | 2,851.06 | 14.16 | |
| Balance third floor, stock | 7,376.76 | 737.68 | |
| | $107,542.99 | $22,698.62 | |
| Add to close | ........ | 4,138.03 | |
| | $107,542.99 | $26,836.65—$107,542.99 | $26,836.65 |

*Nos. 112-114 South Second Street.*

| | | |
|---|---|---|
| Basement, stock ................ | $47,868.58 | $28,721.15 |
| Salt room, stock................ | 832.87 | ........ |
| Shipping room, stock............ | 1,517.05 | 758.52 |
| Balance first floor, stock......... | 77,983.59 | 70,185.24 |
| Second floor, stock.............. | 53,534.85 | 48,448.67 |

| | | |
|---|---|---|
| | $181,736.94 | $148,113.58 |
| Add to close.................... | ........ | 1,886.42 |

| | | | |
|---|---|---|---|
| | $181,736.94 | $150,000.00—$181,736.94 | $150,000.00 |

Total agreed sound value and loss...................... $289,279.93    $176,836.65

The following is what Welpton put in the proofs of loss by way of apportionment of the loss:

"There are two groups of insurance. Group A, aggregating $161,500, covers contents in both sections subject to 80 per cent contribution and *pro rata* distribution clause. Group B, aggregating $93,000, covers contents, blanket both sections, subject to 80 per cent contribution clause, but without the *pro rata* distribution clause.

"PRELIMINARY APPORTIONMENT.

(On basis of all policies written flat.)

| | Total | | Section No. 1. | | Section No. 2. | |
|---|---|---|---|---|---|---|
| | Insures. | Claim. | Insures. | Claim. | Insures. | Claim. |
| Group A.... | $161,500 | $98,081.15 | $60,039.40 | $19,818.04 | $101,460.60 | $78,263.11 |
| Group B... | 93,000 | 78,755.50 | 21,263.11 | 7,018.61 | 93,000.00 | 71,736.89 |
| | $254,500 | $176,836.65 | $81,302.51 | $26,836.65 | $194,460.60 | $150,000.00 |

"ADJUSTER'S NOTE: The blanket policies—group B—being written subject to 80 per cent contribution clause, the policies in that group cannot be holden for more than the limit of recovery under the operation of that clause, viz.:

$$\$93,000 \times \frac{\$176,836.65}{\$231,423.94} \text{ or } \$71,063.53$$

"The policies in Group A (in section 1 only) under same clause cannot be holden for more than the limit of recovery under the operation of the clause, viz.:

$$\$60,039.40 \times \frac{\$26,836.65}{\$86,034.49} \text{ or } \$18,728.05$$

"The assured's recovery under all insurance limited to, viz.:

| | Sec. No. 1. | Sec. No. 2. | Total. |
|---|---|---|---|
| Group A .................................... | $18,728.05 | $78,263.11 | $96,991.16 |
| Group B .................................... | ........ | ........ | 71,063.53 |
| Total ........................................................... | | | $168,054.69 |

| COMPANY. | GROUP A. | | SUBDIVISION—GROUP A. | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Section 1. | | Section 2. | |
| | Insures. | Claim. | Insures. | Claim. | Insures. | Claim. |
| American Ins. Co........ | $1,750 00 | $1,050.98 | $650.00 | $202.94 | $1,099.40 | $848.04 |
| Alliance............... | 5,000.00 | 3,002.83 | 1,858.80 | 579.82 | 3,141.20 | 2,423.01 |
| Concordia.............. | 5,000.00 | 3,002.83 | 1,858.80 | 579.82 | 3,141.20 | 2,423.01 |
| Commercial Union....... | 5,000.00 | 3,002 83 | 1,858.80 | 579.82 | 3,141.20 | 2,423.01 |
| Michigan Commercial.... | 5,000 00 | 3,002.83 | 1,858 80 | 579.82 | 3,141.20 | 2,423.01 |
| National............... | 5,000.00 | 3,002.83 | 1,858.80 | 579.82 | 3,141.20 | 2,423.01 |
| Niagara............... | 10,000.00 | 6,005.65 | 3,717 60 | 1,159.63 | 6,282.40 | 4,846.02 |
| Reliance .............. | 3,000.00 | 1,801.68 | 1,115.30 | 347.89 | 1,884.70 | 1,453.79 |
| Rochester— German Dept. | 1,750.00 | 1,050.98 | 650.60 | 202.94 | 1,099.40 | 848.04 |
| Royal Ins. Co.......... | 5,000.00 | 3,002.83 | 1,858.80 | 579.82 | 3,141.20 | 2,423.01 |
| Sun Ins. Co............ | 10,000 00 | 6,005.65 | 3,717.60 | 1,159.63 | 6,282.40 | 4,846.02 |
| St. Paul............... | 5,000.00 | 3,002.83 | 1,858.85 | 579.82 | 3,141.15 | 2,423.01 |
| Wholesale Groc. Subs.... | 40,000.00 | 24,022.55 | 14,870 45 | 4,638.52 | 25,129.55 | 19,384.03 |
| Wholesale Groc. Subs.... | 60,000.00 | 36,033.86 | 22,305.60 | 6,957.76 | 37,694.40 | 29,076.10 |
| Totals ........... | $161,500.00 | $96,991.16 | $60,039.40 | $18,728.05 | $101,460.60 | $78,263.11 |

GROUP B.

| | | |
| --- | --- | --- |
| Central States Interinsurance Exchange..................... | $5,000.00 | $3,820.62 |
| Fire Association ......................................... | 10,000.00 | 7,641.24 |
| Home Underwriters ...................................... | 3,000.00 | 2,292.37 |
| Individual Underwriters .................................. | 75,000.00 | 57,309.30 |
| Total .............................................. | $93,000.00 | $71,063.53 |
| Grand total ...................................... | $254,500.00 | $168,054.69 |

With $254,500 insurance and an agreed loss of $176,836.65 on a sound value of $289,279.93, why should liability for the loss be limited to $168,054.69, and Subscribers' proportion of the loss be limited to $60,561.41?

It will be observed that in Welpton's apportionment the policies of insurance were classified into two groups. Group A embraced fourteen policies, including those issued by the Subscribers. The policies issued by the Subscribers contained the following provisions:

"Eighty per cent coinsurance Clause: It is expressly stipulated and made a condition of this contract that the Subscribers shall be liable for no greater proportion of any loss than the amount hereby insured bears to eighty per cent (80%) of the actual cash value of the property described herein at the time when such loss shall happen, nor for more than the proportion which this policy bears to the total insurance thereon. If this policy be divided into

two or more items, the foregoing conditions shall apply to each item separately. In the event that the aggregate claim for loss does not exceed two per cent (2%) of the total amount of insurance upon the property described herein and in force at the time such loss occurs, no special inventory or appraisement of the undamaged property shall be required. If this policy be divided into two or more items, the foregoing conditions shall apply to each item separately.

"Average Clause: It is hereby agreed that in case of loss this policy shall attach in each building or division in such proportion as the value in each building or division bears to the aggregate value of the subjects insured.

"The Subscribers shall not be liable in the aggregate under this policy for a greater proportion of any loss on the described property, or for loss by and expense of removal from premises endangered by fire, than the amount hereby insured shall bear to the whole insurance, whether valid or not, or by solvent or insolvent insurers, covering such property."

The other twelve policies of group A contained similar provisions. The four policies of group B contained similar provisions with this single exception—they did not contain an average clause.

Welpton's apportionment refers to "blanket" policies. As distinguished from a specific policy, a policy for $10,000 on a stock of merchandise, comprising, for example, dry goods, groceries, and hardware, is a blanket policy covering all the merchandise. A policy for the same amount on the same stock of merchandise, distributed, $5,000 on dry goods, $3,000 on groceries, and $2,000 on hardware, is specific. Likewise, a policy covering a stock of merchandise in two locations without apportioning the amount between the locations is blanket; a policy for the same amount apportioned, so much to one location and so much to the other, is specific. We have no such situation here.

All the policies, those in group B as well as those in group A, described the insured property in the same way. The description in one of the policies issued by the Subscribers may stand for the description in all of the policies, and was as follows:

"$40,000. On stock of goods, wares and merchandise, including all materials of whatever kind or nature used in or in connection with the preparing, packing, labeling, and distribution of same, owned by the assured or held in trust or on commission, all while contained in the two- and three-story composition roof, brick, stucco building and additions, situated on ground leased of the C. B. & Q. R. R. Co., known as 112-114-116-118 South Second street, city of Atchison, Kan., or on platforms, vehicles or cars within one hundred (100) feet of said buildings and additions."

For the purpose of a statement of sound value and loss, the contents of the building were separately scheduled with reference to location in the building; but the policies recognized no "section

No. 1" or "section No. 2." When Nusbaum notified the Subscribers of the fire, he did not divide his premises into sections consisting of lots 112-114 and lots 116-118. He said the building and contents on lots 112 and 114 were almost a total loss by fire, and there was smoke and water damage to contents and building on lots 114 and 116. Lot 118 was not mentioned. He did not refer to his policies, and his notice of loss, which was nothing but a notice of loss, did not modify the terms of his policies. When the adjusters made their estimates of sound value and of loss, they were merely assessing sound value and loss; and they could not divide any policy to make it insure section No. 1 and section No. 2 separately, any more than they could divide the policies to insure separate sections consisting of basement, first floor, second floor, third floor, cigar room, tablet room, salt room, and shipping room. Each policy insured one item, the stock and accessories, in one place, the building and its additions and appurtenances. The item and place were the same in all of the policies, and the policies control in determining and apportioning liability. The result is that in apportioning the loss there was no justification or excuse for treating the policies in group B as blanket policies and the policies in group A as of some other kind.

The 80 per cent coinsurance clause in the Subscribers' policies provided that the Subscribers should not be liable for a greater proportion of any loss ($176,836.65) than the amount insured ($60,000 in one policy and $40,000 in the other) bore to 80 per cent of the sound value of the property at the time of the fire ($289,279.93). The history, use and abuse of this provision need not be discussed. It is a plain limitation of liability: 80 per cent of the sound value was $231,423.86; $60,000 is approximately 25.96 per cent of $231,423; 25.96 per cent of $176,836.65 is in round numbers $45,900. That was the limit of liability on the $60,000 policy. Using the same method of computation, the limit of liability on the $40,000 policy was in round numbers $30,600. The limit of liability on the two policies exceeded $76,500. The Subscribers paid on the $60,000 policy the sum of $36,033.86 and on the $40,000 policy the sum of $24,022.55, a total of $60,056.41. When they pay $9,427.53 more, or a total of $69,483.94, the limit of liability on the two policies will not have been reached. This is true of all the policies, and the 80 per cent coinsurance clauses were fully satisfied.

It will be observed that in the apportionment of loss, Welpton

referred to the 80 per cent coinsurance clause as the "80 per cent contribution clause." The statement of loss which Welpton prepared and inserted in the proofs of loss is copied above. Immediately below the summary, "Total agreed sound value and loss—$289,279.93 [sound value]—$176,836.65 [loss]," he inserted the following: "Eighty per cent contribution clause complied with"—and of course it was complied with.

The 80 per cent coinsurance clause provided that if the policy be divided into two or more items, the condition which has been considered should apply to each item separately. Neither of the Subscribers' policies was divided into two or more items. None of the other sixteen policies was divided into two or more items, and this part of the clause was not invokable in determining liability. For the same reason the average clause in the fourteen policies of group A was of no consequence in determining liability. There was no division of building, or subject of insurance, or amount of insurance, in any policy.

Policies of group A, other than the policies of the Subscribers, contained a clause called a *pro rata* distribution clause, having the same legal effect as the average clause in the Subscribers' policies. The *pro rata* distribution clause read as follows:

"It is a condition of this policy that the amount insured hereunder shall attach in or on each building, shed and other structure and (or) place, in that proportion of the amount hereby insured that the value of the property covered by this policy in or on each said building, shed and other structure and (or) place, bears to the value of all the property described herein."

As indicated, the property was described in all the policies as one item in one place, and there could be no *pro rata* distribution of the amount insured, according to the proportion which the value of the property in each of several buildings, structures, or places bore to the total value of the property described. Therefore the court properly held that since each policy in both groups insured but one item, there was no room for application of the average or *pro rata* distribution clauses. Besides that, the court found, as a fact, that the *pro rata* distribution clause was omitted from one of the policies in group B by mutual mistake, and that by reason of general basis schedules on file in the office of the superintendent of insurance it was necessary that all the policies in group B should contain a *pro rata* distribution clause. Consequently, there was no basis for classifying the policies according to presence or absence of the clause.

Of course, the Subscribers cannot be held, and the judgment does not hold them, for a greater share of the loss than the proportion which their policies bear to the total insurance. The judgment does hold them for just that.

Employing a division of the stock of merchandise which the adjusters made, but which the policies did not make, Welpton undertook to apportion the loss according to what is known as the "Connecticut rule," or "gradual reduction rule," governing apportionment of loss when insurance is part blanket and part specific. The rule was announced in the case of *Schmaelzle v. London & L. Fire Ins. Co. et al.*, 75 Conn. 397. The facts in that case were these: The plaintiff owned a brewery, comprising buildings, machinery and stock, and carried insurance to the amount of $60,000 in thirty-four companies. Thirty-one of the policies were blanket policies covering buildings, machinery and stock, as a whole. Three policies were specific. The distribution of insurance was the same in each specific policy—a stated sum on each of four items: Main building, stock, machinery, and shed. A fire damaged the main building and the machinery, and destroyed the stock. The shed was not damaged. Sound value and amount of loss were agreed to. The question was how should the loss be apportioned among the insurers. The third paragraph of the syllabus reads as follows:

"That the loss should be adjusted as follows: Divide the entire property into items corresponding to those in the specific policies, for the purpose of taking the items in the order of the greatest loss; in computing the amount of insurance upon the first item, apply the full amount of the blanket insurance; in computing the subsequent items, follow the same procedure, save that the total amount of insurance be reduced by the amount of blanket insurance already exhausted, and the amount of insurance under any given blanket policy be reduced by the amount thereof used in prior adjustments."

It will be observed the division was into items corresponding to the division in the specific policies. The Connecticut rule has been severely criticized; but we have no occasion to consider the soundness of that rule or any other rule relating to apportionment of loss among blanket and specific policies.

In view of the provisions of the policies of insurance, Welpton's reduction of liability and apportionment of the reduced liability were so patently arbitrary and fallacious that it is not surprising the district court found he acted in bad faith.

It is not necessary to give a summary of the pleadings. Plaintiff sued on the policies, did not abandon the theory of recovery on the

policies, and recovered on the policies. Defendants rely on the settlement made with plaintiff on the basis of the proofs of loss. Defendants contend there was a dispute concerning what the Subscribers owed, that a compromise was effected, and that payment was made accordingly as shown by the receipts plaintiff signed. One of the receipts reads as follows:

"Partial loss, $36,033.86. June 28, 1921.

"Received of Wholesale Grocery Subscribers at Warner Interinsurance Bureau, Lansing B. Warner, Incorporated, attorney, the sum of thirty-six thousand thirty-three and 86/100ths dollars, it being in full payment and compromise settlement of all claims and demands for loss or damage by fire, which occurred on the twelfth day of May, 1921, to the property insured under policy No. 19782, issued at the Chicago office of said Subscribers, and in consideration of said payment, the sum insured is reduced in that amount, leaving the sum of twenty-three thousand nine hundred sixty-six and 14/100 dollars, only, now in force under said policy, covering proportionately, and in the same manner, on the various items named therein, as the amount of loss thereon bears respectively thereto.

| Claim | $36,033.86 |
|---|---|
| Discount | ........ |
| Net amount paid | 36,033.86" |

The other receipt was identical in form and differed only in the amount received, policy number, and insurance remaining in force. Plaintiff contends there was no consideration for acceptance of part of the Subscribers' share of the loss in satisfaction of the whole sum due, and contends the sums paid were paid and received and the receipts were executed under mutual mistake of fact. The findings of fact covered the contentions of both plaintiff and defendants.

Such disputes as plaintiff and the adjusters had about value and loss were composed by the signed memorandum wherein sound value and loss were agreed to. After plaintiff and the adjusters had agreed, and the time arrived for the adjusters to apportion the loss among the insurers, nothing remained to fix the individual liability of each insurer except a mathematical calculation based on fixed data, and plaintiff's claim against the Subscribers was a liquidated claim. After the adjusters had dealt with the subject of apportionment, Welpton sent proofs of loss containing his apportionment to plaintiff for execution. The proofs of loss made claim against the Subscribers according to the apportionment, and consequently for a part only of the sum due. Nusbaum then had

an unsatisfactory interview with Welpton concerning the apportionment calculations.

The court made the following finding of fact:

"This dispute, if it can be called such, was not an honest dispute on the part of Welpton, but purely an arbitrary one based on mere pretense made for the obvious purpose of exacting terms which were inequitable and oppressing."

The finding is conclusive here, and there was no dispute in a legal sense to be adjusted by compromise.

"While it is not necessary that the dispute or controversy should be well founded, it is necessary that it should be in good faith. Without an honest dispute, an agreement to take a lesser amount in payment of a liquidated claim is without consideration and void. A dispute cannot be raised for the mere purpose of extorting money. And an arbitrary refusal to pay, based on the mere pretense of the debtor, made for the obvious purpose of exacting terms which are inequitable and oppressive, is not such a dispute as will satisfy the requirements of the rule." (1 C. J. 554.)

At the interview between Nusbaum and Welpton they did not reach an agreement, and Nusbaum could use the forms Welpton prepared or make proof as the policies required. The policies did not require that proofs of loss should contain any exemplified apportionment, and when, subsequent to his interview with Welpton, Nusbaum signed Welpton's form of proof of loss containing the superfluous apportionment Nusbaum did not compromise anything with Welpton.

The word "compromise" is frequently loosely used to the confusion of the law. Properly there is no compromise when either debtor or creditor merely accedes to the unabated demand of the other. According to the approved usage of language, "to compromise" is to adjust and settle by mutual concessions (Webster's International Dictionary), and this meaning is approved by the courts (2 Words and Phrases 1374). In this instance Welpton made no concessions.

In this connection some observations of the Colorado court in the case of *Assurance Co. v. Hunt,* 75 Colo. 21, are pertinent. In that case the insured was a woman. The insurer pretended it was not liable for the full amount of a fire loss on the false ground that a "three-fourths value clause" not in the policy should have been attached to it. The insured acquiesced and accepted payment of a smaller sum than was due. The court said:

"Assuming, as we must, the truth of the evidence which supports that finding, we learn that the company admitted a loss of at least $3,600, that by a sham contention as to its legal liability it raised a pretended controversy, and as a compromise thereof paid plaintiff $600 less than, under the fact conceded by it, was due her.

"The same fundamental principles govern in 'accord and satisfaction' whether the claim be liquidated or unliquidated. In either there must be considerations, and in each these are mutual concessions. In the case of unliquidated claims there may be, and often are, concessions of positions taken by parties to the controversy. The controversy may relate either to the law or the facts, and the concessions may be of either. If, however, the settlement be for less than the undisputed debt, or if the sole dispute is due to a sham claim of legal exemption put forward by one of the parties, there can be no mutual concessions, hence no consideration." (p. 24.)

Besides what has been said, Nusbaum did not settle his loss with adjuster Welpton. Plaintiff settled with Warner as attorney in fact for the Subscribers, and that settlement was made, so far as the record shows, without the slightest friction.

Nusbaum signed the proofs of loss, they were transmitted to Warner, Warner paid accordingly, and Nusbaum executed receipts accordingly. The court made the following findings:

"13.

"First. The parties mistakenly assumed that each policy was divided into two items, whereas, it was fixed as one item by the policies. . . .

"Third. There was a mistake in assuming that the *pro rata* distribution clause was not a part of those four policies from which it was physically omitted. . . .

"15.

"There was mutual mistake inhering in the receipts in full in the following particulars:

"First. All parties assumed that there were two separate items in each policy, when in fact there was but one in each policy.

"Second. All parties assumed that four of the policies did not contain the average or *pro rata* distribution clause, when in fact it was omitted by mutual mistake and must be read into the policies by virtue of general basis schedules on file with the superintendent of insurance."

These findings are conclusive here.

Defendants contend plaintiff was estopped to claim more than it received because of a policy issued to plaintiff after the settlement in lieu of the insurance still in force under the old policies.

The fire occurred May 12, 1921, the adjustment occurred about June 12, and the receipts were dated June 28. The receipts stated the amount of insurance unabsorbed by the loss paid. The total

insurance under the two policies was $100,000. The total amount paid was slightly more than $60,000, which, according to the receipts, left slightly less than $40,000 still in force. The remaining merchandise covered by the policies was in the part of the building on lots 116-118. On June 30 plaintiff wrote a letter to Warner requesting a statement that the remainder of the policies should apply to the merchandise located at 116, 118 South Second street. The statement was not sent, but on July 2 a new policy, expiring July 2, 1922, was issued for the round sum of $40,000 on the merchandise so located. The term of the policy expired, without loss having occurred, before the action was commenced.

The court found there was no evidence issuance of the new policy formed any part of the consideration for the settlement, and plaintiff did not enjoy insurance for $40,000 for a year by virtue of the settlement. By virtue of the settlement plaintiff received a little more than $60,000 in cash. With the settlement concluded, plaintiff took up with Warner the subject of insurance in force on the remainder of the stock of merchandise—a purely collateral matter.

Defendants say in their brief, "The policy only represented the insurance not absorbed by the loss." The statement is true and goes to the essence of the matter; and because the statement is true the extent of liability on the policy never was greater than the correct amount of unabsorbed insurance.

After the settlement the plaintiff moved promptly to procure a corrected apportionment of loss, and on August 2 a new apportionment was made. All the insurers agreed to it, and Welpton agreed for the Subscribers that payment would be made accordingly. The court found Welpton was authorized to do this, and the finding is conclusive here. So far as the record shows, the effect on the new policy, just a month old, was overlooked. If the Subscribers had chosen to pay, no doubt the procedure would have been to cancel the policy and issue another for the correct amount, or, if plaintiff chose to keep the policy, make an adjustment of premium. Instead of paying, the Subscribers chose to repudiate their agreement and forced plaintiff to sue for the balance of a sum about which there should have been no controversy, and about which there probably would not have been controversy if the expert Welpton had acted fairly in the first place. The Subscribers denied all liability, claimed the loss had been settled and had been paid, and pleaded that the expired policy had afforded protection according to its terms. Plaintiff was entitled to the protection of insurance for more than $30,000

of the $40,000 stated in the policy, and in view of the attitude of the Subscribers, tender of premium for the excess insurance was not required in order to qualify plaintiff to meet the defense of settlement by impeaching the settlement.

Plaintiff was not estopped to maintain the action because it collected what it could with intention to get more if possible. The Subscribers did not change their position for the worse in making the settlement. They owed all they paid—and much more.

The result of the foregoing is, the defense of estoppel was without merit.

Enough has been said to dispose of the appeals, and this opinion may not be extended further.

The appeals of Warner Reciprocal Insurers and Lansing B. Warner, Incorporated, are dismissed. The judgment against Wholesale Grocery Subscribers is affirmed.